# Exhibit 1

# UNITED STATES PATENT AND TRADEMARK OFFICE

_____

# BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

JUPITER RESEARCH, LLC,

Petitioner,

v.

VPR BRANDS, LP,

Patent Owner.


Case IPR2022-00299

Patent 8,205,622


Before PETER A. JONES, Trial Paralegal


PATENT OWNER'S PRELIMINARY RESPONSE

## LIST OF EXHIBITS

| Exhibit No. | Title of Document |
|---|---|
| 2003 | Letter dated 11/08/2019 from VPR to Jupiter |
| 2004 | Letter dated 12/19/2019 from Jupiter to VPR |
| 2005 | Letter dated 03/13/2020 from VPR to Jupiter |
| 2006 | Letter dated 05/20/2020 from Jupiter to VPR |
| 2007 | Complaint filed 11/13/2020, VPR v. Jupiter (ECF 0001) |
| 2008 | VPR v. Jupiter AZD Docket Sheet as of 04-14-2022 |
| 2009 | Executed Waiver of Service of Summons dated 12/15/2020 |
| 2010 | VPR Email dated 11/19/2020 with Notice of Lawsuit and Request to Waive Service |
| 2011 | Jupiter's Answer/Counterclaim Filed 01/19/2021 (ECF 0011) |
| 2012 | Joint Case Management Report filed 02/22/2021 (ECF 0017) |
| 2013 | Jupiter's Invalidity Analysis |
| 2014 | Jupiter's Responses to VPR's 1st Round of Discovery Requests |
| 2015 | VPR's Deposition Notice dated 04/19/2021 |
| 2016 | Jupiter's Supplemental Responses to VPR's 1st Round of Discovery Requests |
| 2017 | VPR's Opening Claim Construction Brief and Jupiter's Responsive Claim Construction Brief |
| 2018 | Jupiter's Proposed Order Accompanying Jupiter's Responsive Claim Construction Brief |
| 2019 | Jupiter's Motion to Stay Filed 12/27/2021 (ECF 0030) |
| 2020 | Joint Discovery Dispute Filed 03/14/2022 (ECF 0040) |
| 2021 | AZD Minute Entry dated 03/18/2022 Regarding a Discovery Dispute Hearing (ECF 0043) |
| 2022 | Jupiter's Supplemental Responses to VPR's 2nd Round of Discovery Requests |
| 2023 | Jupiter's Meet and Confer Request and Deposition Notices |

## TABLE OF CONTENTS

I.  INTRODUCTION ..................................................................................1

II.  PROCEDURAL BACKGROUND .........................................................2

III.  OVERVIEW OF THE '622 PATENT AND THE CITED ART .................8

   A. Overview of the '622 Patent...............................................................8

   B. Claim Construction .........................................................................12

   C. Overview of the Cited Prior Art......................................................13

     1. Hon ...........................................................................................13

     2. Cox ...........................................................................................16

     3. Zhu ...........................................................................................18

IV.  ANALYSIS ......................................................................................22

   A. Institution should be denied because the patented invention is distinguishable from the cited prior art. ......................................22

     1. Ground 1 – Claims 13, 14, 15, 17 and 18 Are Not Anticipated under § 102 by Hon........................................................................22

     2. Ground 2 – Claims 13, 14, and 15 Are Not Anticipated under §102 by Cox. ..............................................................................25

     3. Ground 3 – Claim 16 is Not Obvious under §103 by Hon in View of Zhu. .................................................................................28

     4. Ground 4 – Claims 16, 17 and 18 are Not Obvious under § 103 by Cox in View of Zhu. ..............................................................30

   B. The Petition is time barred under § 315(b) ..................................30

     1. It is Petitioner's Burden to Demonstrate Timeliness and Jupiter has Failed to Meet its Burden....................................................35

2. Jupiter Executed the Waiver of Service Acknowledging Receipt of the Complaint More than One Year Before the Petition was Filed. .......... 36

V.   The requested review should not be instituted because of Jupiter's Undue Delay, and because it is unnecessary and counterproductive to litigation costs. ................................................................................................ 37

VI.  The Board should use its discretion under § 314(a) to deny institution. .. 40

   1. The District Court has not granted a stay despite a motion being filed about four (4) months ago in December, 2021. ......................................... 41

   2. No trial date is set; discovery is set to close in June, and dispositive motions are due in July. ................................................................. 41

   3. The parties have invested a lot of time and effort in progressing the case in district court, including submitting a stipulated claim construction order which dispenses of the need of a *Markman* hearing. ...................... 41

   4. The issues raised here are identical to the issues raised in the district court action. ................................................................................. 41

   5. The petitioner and the defendant in the parallel proceeding is the same party, Jupiter. ........................................................................... 41

   6. The petition should be denied on its merits; it is time-barred; and Petitioner engaged in undue delay. ............................................... 41

VII. CONCLUSION ................................................................................ 42

# TABLE OF AUTHORITIES

**Cases**                                                                   **Page(s)**

*Abbott Vascular, Inc. v. FlexStent, LLC,*
   IPR2019-00882 (P.T.A.B. Oct. 7, 2019) ......................................................... 42

*Apple Inc., v. Fintiv, Inc.,*
   IPR2020-00019 (P.T.A.B. Mar. 2020) (precedential) ................................. 40, 41

*Brinkmann Corp. v. A&J Mfg., L.L.C.,*
   IPR2015-00056 (P.T.A.B. Mar. 23, 2015) ....................................................... 34

*Click-To-Call Techs., LP v. Ingenio, Inc.,*
   899 F.3d 1321 (Fed. Cir. 2018) ................................................................ *passim*

*Dynamic Drinkware, L.L.C. v. Nat'l Graphics, Inc.,*
   800 F.3d 1375 (Fed. Cir. 2015) ........................................................................ 23

*Elan Pharms., Inc. v. Mayo Found. for Med. Educ. & Rsch. ,*
   346 F.3d 1051 (Fed. Cir. 2003) ........................................................................ 26

*Harmonic Inc. v. Avid Tech., Inc.,*
   815 F.3d 1356 (Fed. Cir. 2016) ........................................................................ 23

*Henderson v. United States,*
   517 U.S. 654 (1996) ......................................................................................... 33

*Illumina, Inc. v. Natera, Inc.,*
   IPR2019-01201 (P.T.A.B. Dec. 18, 2019) ....................................................... 43

*In re Hoeksema,*
   399 F.2d 269 (Aug. 8, 1968) ............................................................................ 26

*Intel Corp. v. VLSI Tech. LLC,*
   IPR2019-01192 (P.T.A.B. Jan. 9, 2020) .......................................................... 43

*Johnson Health Tech. Co. v. Icon Health & Fitness, Inc.,*
   IPR2014-01242 (P.T.A.B. Feb. 11, 2015) ....................................................... 39

*K/S HIMPP v. Hear-Wear Techs., L.L.C.,*
   751 F.3d 1362 (Fed. Cir. 2014) ........................................................................ 29

*KSR Int'l Co. v. Teleflex Inc.,*
   550 U.S. 398 (2007) ......................................................................................... 28

*Magellan Midstream Partners L.P. v. Sunoco Partners Marketing & Terminals L.P.,*
   IPR2019-01445 (P.T.A.B. Jan. 22, 2020) ........................................................... 43

*Motorola Mobility L.L.C. v. Arnouse,*
   IPR2013-00010 (P.T.A.B. Jan. 30, 2013) ........................................................... 34

*NHK Spring Co., Ltd., v. Intri-Plex Techs., Inc.,*
   IPR2018-00752 (P.T.A.B. Sept. 12, 2018) (precedential) ................................ 40

*O2 Micro Int'l, Ltd. v. Monolithic Power Sys.,*
   467 F.3d 1355 (Fed. Cir. 2006) ........................................................................ 39

*Oil States Energy Servs., L.L.C. v. Greene's Energy Grp., L.L.C.,*
   138 S. Ct. 1365 (2018) ....................................................................................... 40

*Pragmatus Mobile, L.L.C. v. Amazon.Com, Inc.,*
   2015 WL 3799433 (D. Del. June 17, 2015) ...................................................... 39

*Realtime Data L.L.C. v. Actian Corp.,*
   2016 WL 3277259 (E.D. Tex. June 14, 2016) ............................................... 38-39

*Scotts Co. v. Encap, L.L.C.,*
   IPR2013-00110 (P.T.A.B. July 3, 2013) ........................................................... 34

*Sony Interactive Entertainment LLC v. BOT M8, LLC,*
   IPR2020-01218 (P.T.A.B. Jan. 27, 2021) ...................................................... 28-30

Streak Prods., *Inc. v. Antec, Inc.,*
   *2010 WL 3515752, at *2* (N.D. Cal. Sept. 8, 2010) ......................................... 40

*TPK Touch Sols., Inc. v. Wintek Electro-Optics Corp.,*
   2013 WL 6021324 (N.D. Cal. Nov. 13, 2013) .................................................. 39

*TruePosition Inc. v. Polaris Wireless Inc.,*
   2013 WL 6020798 (D. Del. Nov. 12, 2013) ...................................................... 39

*TruePosition, Inc. v. Polaris Wireless, Inc.,*
   2013 WL 5701529 (D. Del. Oct. 21, 2013) ....................................................... 39

*Ventex Co., Ltd. v. Columbia Sportswear N. Am., Inc.,*
   IPR2017-00651, Paper 152 at 4 ........................................................................ 35

*Verdegaal Bros. v. Union Oil Co.,*
   814 F.2d 628 (Fed. Cir. 1987) .......................................................................... 22

*West v. Jewelry Innovations, Inc.,*
  2008 WL 4532558, at *3 (N.D. Cal. Oct. 8, 2008) ..................................... 39-40

*Wis.-Fi One, L.L.C. v. Broadcom Corp.,*
  878 F.3d 1364 (Fed. Cir. 2018) ....................................................................... 32

*Worlds Inc. v. Bungie, Inc.,*
  903 F.3d 1237 (Fed. Cir. 2018) ....................................................................... 35

**Statutes**

37 C.F.R. § 42.6(a) ........................................................................................... 46

37 C.F.R. § 42.24(a)(1) ..................................................................................... 46

37 C.F.R. § 42.104 ............................................................................................ 23

35 U.S.C. § 102 ................................................................................... 22, 25, 26

35 U.S.C. § 103 ................................................................................... 22, 28, 30

35 U.S.C. § 103(a) ............................................................................................ 28

35 U.S.C. § 312(a)(3) ....................................................................................... 23

35 U.S.C. § 314(a) ................................................................................... 2, 40, 43

35 U.S.C. § 315 ................................................................................................. 31

35 U.S.C. § 315(b) ..................................................................................... *passim*

35 U.S.C. § 316(e) ............................................................................................ 23

**Rules**

Fed. R. Civ. P. 4(d) ............................................................................... 4, 33, 36

Fed. R. Civ. P. 4(d)(4) ...................................................................................... 34

Fed. R. Civ. P. 16 .......................................................................................... 4, 5

Fed. R. Civ. P. 26 .............................................................................................. 6

Fed. R. Civ. P. 26(a)(3) .................................................................................... 42

Fed. R. Civ. P. 30(b)(6) ............................................................................. *passim*

**Other**

*Black's Law Dictionary*
  (9th ed. 2009) .............................................................................................. 33-34

M.P.E.P. § 2121.01 ........................................................................................... 26

M.P.E.P § 2131 ................................................................................................ 22

Patent Owner, VPR BRANDS, LP, ("VPR") files this Opposition and the accompanying Declaration of Joel B. Rothman ("Rothman Decl.") in response to JUPITER, LLC's ("Jupiter" or "Petitioner") Petition for *Inter Partes Review* of United States Patent Number 8,205,622 (the "'622 Patent"), filed December 20, 2021 (the "Petition").

Patent Owner respectfully requests the Director deny institution.

## I.    INTRODUCTION

Jupiter's petition fails to demonstrate a "reasonable likelihood that petitioner will prevail," and also fails to establish a reasonable likelihood that the challenged claims are unpatentable by a preponderance of the evidence. Jupiter's references fail to disclose, teach, or otherwise make obvious, the claimed "electric airflow sensor" and "single chip micyoco" (microcontroller) of the challenged claims. Institution should be denied.

The Petition is untimely under 35 U.S.C. § 315(b). Petitioner waited over one year after being served with a Complaint alleging infringement of the '622 Patent before filing its petition.

Jupiter's petition is time-barred and institution should be denied.

Even if timely, Jupiter waited until the last possible moment to file its petition. Claim Construction concluded in the Arizona District Court action prior

to Jupiter's filing, and the parties agreed upon construction (Ex 1006). Jupiter can provide no valid explanation for its undue delay.

Discovery is nearly complete in the Arizona District Court action. The District Court action is likely to be over before this proceeding even gets underway. No purpose can be served by instituting this petition.

The Board should exercise its discretion and deny institution, pursuant to 35 U.S.C. § 314(a).

## II.    PROCEDURAL BACKGROUND

1.    On November 8, 2019, VPR sent Jupiter a letter accusing Jupiter's vaping device of infringement of the '622 patent. The letter contained the '622 patent and an infringement claim chart showing Jupiter's Liquid 6 device infringed with a claim by claim and element by element analysis. See Exhibit 2003.

2.    On December 19, 2019, Jupiter responded. Jupiter's response denied infringement. Jupiter's denial was based upon a "careful[ ] review [of] your analysis, the prosecution history of the '622 Patent and our client's Liquid 6 product." Jupiter claimed, inter alia, that the Liquid 6 lacked the "diaphragm microphone" element in the '622 patent. See Exhibit 2004.

3.    On March 13, 2020, VPR responded to Jupiter. VPR's response contained a detailed explanation of the diaphragm microphone element of the '622

patent. VPR also included a certified English translation of the Chinese Parent-Patent to the '622 patent. See Exhibit 2005.

4.    On May 20, 2020, Jupiter responded "[t]his correspondence is in response to your letter on March 13, 2020 providing further discussion of U.S. Patent No. 8,205,622 (hereinafter "the '622 Patent") and claiming infringement. We have had several discussion with our client and considered your input carefully and provide the following in response." In that same letter counsel for Jupiter acknowledged that they have been searching prior art as early as May 20, 2020.

> While we strongly disagree with your position and claim construction analysis, that is immaterial at this point. Attached is copy of an International Patent Application having International Publication Number WO2008/138650 (hereinafter "the '650 Application"). As seen on the front page of the '650 Application, this application was filed February 4, 2008 more than a year before the priority date of the '622 Patent, and further the '650 Application has a priority date of May 11, 2007, almost two years before the priority date of the '622 Patent. **Accordingly, this reference qualifies as priort** [sic] **art to the '622 Patent.**

See Exhibit 2006.

Additionally in that letter, Jupiter's counsel indicated "…any action…would be met with a claim of invalidity or a filing of reexamination of the '622 patent".

5.      On November 13, 2020, VPR sued Jupiter for infringement. VPR filed a complaint against Jupiter, Case No. 2:20-cv-02185, in the United States District Court for the District of Arizona (the "Arizona Case"). See Exhibit 2007.

6.      By letter dated November 19, 2020, VPR contacted Jupiter's counsel by email advising of the filing of the Arizona case, and requested Jupiter agree to a waive service in compliance with Rule 4(d) of the Federal Rules of Civil Procedure. VPR's November 19, 2020, letter enclosed the complaint in the Arizona case, the exhibits to the complaint, including a claim chart a notice of lawsuit and a service waiver. On December 15, 2020, Jupiter's counsel executed and returned the waiver of service. On December 21, 2020, VPR filed the waiver of service with the Court. See Exhibit 2010.

7.      On December 21, 2020, the Court issued an Order Setting Rule 16 Scheduling Conference for March 2, 2021.

8.      On January 19, 2021, 60 days after receiving the complaint, Jupiter filed its answer and counterclaims. Paragraph 14 of Jupiter's Answer acknowledged receipt of the complaint. Jupiter's defenses and counterclaims acknowledged an in-depth analysis of the '622 patent, the complaint, the '622 patent's prosecution history, and the claims asserted against Jupiter. See Exhibit 2011.

9.      The parties met to discuss the proceedings of the Arizona case. The parties prepared a joint case management report. On February 22, 2021, the parties filed their agreed joint case management report. The report proposed that fact and expert discovery be completed by June 2, 2022. See Exhibit 2012.

10.     On the same day, February 22, 2021, VPR promptly served its first set of discovery requests.

11.     On February 26, 2021, in her Rule 16 scheduling order, Judge Diane J. Humetewa ordered that opening claim construction brief is due 11/1/2021. Responsive Claim Construction Brief due 11/15/2021. Reply Claim Construction Brief due 11/22/2021. Discovery due by 6/3/2022. Dispositive motions due by 7/6/2022. Judge Humetewa also vacated the Rule 16 scheduling conference set for 3/2/2021. See Exhibit 2008 at ECF 19.

12.     On February 26, 2021, VPR served Jupiter with a request for inspection.

13.     On March 5, 2021, after circulating a copy amongst the parties, VPR filed a Proposed Clawback Order and made a joint motion for a Protective Order to be put in place. Exhibit 2008 at ECF 20.

14.     On March 8, 2021, the Motion for Clawback Order was granted and signed by Judge Humetewa. See Exhibit 2008 at ECF 22.

15.    On March 22, 2021, VPR served Jupiter with its Rule 26 initial disclosures and filed same with the Court. See Exhibit 2008 at ECF 23.

16.    On March 31, 2021, Jupiter served VPR with its invalidity analysis. See Exhibit 2013.

17.    On March 23, 2021, Jupiter served VPR with its Rule 26 initial disclosures and filed same with the Court.

18.    On April 13, 2021, Jupiter responded to VPR's request for production and interrogatories. See Exhibit 2014.

19.    On April 19, 2021, VPR served its notice of deposition under Fed. R. Civ. P. 30(b)(6). See Exhibit 2015.

20.    On July 27, 2021, VPR took the deposition of Jupiter's Corporate representative, Jordan Walker, Director of Engineering at Jupiter Research.

21.    On October 5, 2021, Jupiter supplemented its response to VPR's Request for Production[1] with extensive prior art research findings. Jupiter responded: "Defendant provides Documents DEF000915-DEF001135 and DEF001239-DEF001640 which are responsive to this request. Defendant continues to gather documents through the discovery process and will supplement this response as documents are gathered. See Exhibit 2016.

---

[1] Request for Production No. 20.: "All documents and ESI containing prior art to the patent-in-suit or that you contend would anticipate or otherwise render obvious any claim or claims of the patent-in-suit.

22.     On November 22, 2021, VPR served its claim construction brief (ECF 27). On December 6, Jupiter filed its responsive claim construction brief. Jupiter's response agreed with VPR's constructions. See Exhibit 2017.

23.     On December 6, 2021, the Parties filed a proposed order stating that: "it appearing from the filings that none of the parties' previously identified 'claims requiring construction' remain in dispute" and provided the Court with a chart of all the terms and their agreed upon proposed construction. See Exhibit 2018.

24.     On December 20, 2021, Jupiter filed an incomplete petition for an IPR. On January 19, 2022, Jupiter amended and corrected its petition and was accorded a filing date.

25.     On December 27, 2021, Jupiter filed a motion to stay the case which has yet to be ruled on. Providing the Board with no indication that the case would be stayed in case the board decides to institute. See Exhibit 2019.

26.     On March 14, the parties filed a joint notice of discovery dispute. See Exhibit 2008 at ECF 40.

27.     On March 18, 2022, the Court held a telephonic discovery dispute hearing and instructed Jupiter to supplement its discovery responses based on the agreed upon claim construction order that the parties proposed to the court. See Exhibit 2008 at ECF 43.

28.    On April 13, 2022, Jupiter supplemented its discovery responses, based on the agreed upon claim construction. See Exhibit 2022.

29.    On April 14, 2022, Jupiter requested a meet and confer and noticed several depositions, including VPR's infringement expert. See Exhibit 2023.

## III.    OVERVIEW OF THE '622 PATENT AND THE CITED ART

### A. Overview of the '622 Patent

The '622 Patent is directed to disclose a novel electronic cigarette. The '622 patent improved and simplified both e-cigarette construction and electronic circuitry, through the use of a single chip microcontroller[2] to control the vaporization process upon activation by an electric airflow sensor.

The electric airflow sensor detects air movement generated by a user's inhaling or puffing action. Upon detecting air movement, the sensor sends a signal to the single chip microcontroller. The microcontroller in turn sends a signal to the power supply (battery) to supply electric power to the heating element of the atomizer which initiates vaporization. ('622 Patent, col. 2, ln. 51-64). In a preferred embodiment, the '622 patent discloses an electric airflow sensor as a diaphragm microphone which converts pressure waives into electrical energy using a thin sheet of material capable of vibrating.

---

[2] A Micyoco is a microcontroller including a processor, software instructions to be executed by the processor, memory, and I/O processed by the processor.

In its preferred embodiment, the electronic cigarette is constructed of two primary components, an electronic inhaler and an electronic atomizer. Each primary component houses sub-components. Figures 2 and 5, shown below, detail the structure for the atomizer and inhaler components of the '622 Patent, respectively.[3]



One advantage of the '622 patent is that it integrates the liquid container with the heating element together in the atomizer unit. ('622 Patent, col. 2, ln. 65 - col. 3, ln. 3, Figure 2). Challenged claims 17 and 18 require an integrated atomizer, wherein the "electronic atomizer includes a container and media within the container, the media is soaked by with a solution to be atomized."

---

[3] Parenthetical annotations added to identify key components relevant to patentability analysis presented herein.

Previous atomizing units in the prior art were non-integrated. Instead, the atomizing unit was separated from chambers for storing the atomizing liquid. The liquid chamber was made as a separate piece that needed to be inserted into the atomizing chamber before the electronic cigarette could be used. For example, USPN 8,75,957 ("Hon"), cited by Jupiter in the Petition, disclosed a separate "cigarette bottle assembly" that needed to be inserted into the atomizer assembly prior to use. (Hon, col. 3, ln. 1-3, ln. 48-54, and Figure 4.)

Another advantage of the '622 Patent is the electric airflow sensor that detects the user's "puffing" action. When the user inhales through a mouthpiece, the inhalation airflow automatically wakes-up the device and initiates the vaporization process. ('622 Patent, col. 3, ln. 23-28, Figure 5.)

Every challenged claim (13-18) of the '622 Patent requires an "electric airflow sensor." Challenged Claims 14, 17 and 18 further require that the "airflow sensor [be] a diaphragm microphone."

Prior devices either required manual initiation of the vaporization process or employed mechanical sensors. As outlined in section B below, the prior art cited by Jupiter in its Petition utilized mechanical pressure sensors that failed to disclose or teach (or otherwise make obvious) the electric airflow sensor of the present invention.

10

Another advantage of the '622 Patent is the single chip microcontroller, referred to as a "Micyoco", to control the entire vaporization process. The single chip microcontroller places all of the control circuits for the electronic cigarette in a single chip with programming. Programming a single chip with all the necessary instructions for sending electrical signals to the atomizer component is simpler than using multiple different transistors, and other circuit components, to perform the same function. The electric airflow sensor, upon detecting an airflow, sends a signal to the single chip micyoco, which in turn sends a signal to control the duration and magnitude of the electric current provided to the heating element. ('622 Patent, col. 4, ln. 18-23 ("The single chip micyoco 3 instructs the electric power source 5 to supply electricity to the system by its 1 embedded computer programs when a signal is generated through the airflow detected by the electric sensor 6 from the user's puffing action."))

Challenged claims 13-15 of the '622 Patent require a "single chip micyoco" (microcontroller) that both "receives the signal from the electric airflow sensor" and "instructs the electric source to send an electric current to the electronic atomizer, and a time period and magnitude of the electric current."

As outlined below, the prior art cited by Jupiter in its the Petition omitted the use of a single chip microcontroller, or the cited art utilized multiple control circuits to control the atomization process. The cited art failed to disclose or teach

11

(or otherwise make obvious) the single chip microcontroller of the present invention that functions to both receive the signal from the airflow sensor, and instruct the power source on the time period and magnitude of the electric current sent to the heating element of the atomizer.

### B. Claim Construction

The parties stipulated to claim construction in the Arizona case. Exhibit 1006. The following agreed upon claim constructions are relevant here.

| Claim Term | Appears in Claims | Proposed Construction |
|---|---|---|
| Electric airflow sensor | 13,14,15,16,17,18 | An electric sensor to detect air movement generated by a user's inhaling or puffing act. |
| That is detecting air flow | 13, 14, 15, 17, 18 | detecting air movement generated by a user's inhaling or puffing act |
| Diaphragm microphone | 14, 17, 18 | A device for converting pressure waves into electrical energy using a thin sheet of material that is capable of vibrating. |
| Single Chip Micyoco | 13,14,15,16 | A microcontroller including a processor, software instructions to be executed by the processor, memory, and I/O processed by the Processor. |
| instructs | 13, 14, 15 | Provides a signal that tells the power supply to provide or not provide electricity to the inhaler and atomizer. |
| Time period and a magnitude of the electric current | 13, 14, 15 | The duration of time and the strength of the current that is provided to the heating element. |

### C. Overview of the Cited Prior Art

The IPR petition asserts three prior art references: (1) United States Patent No. 6,234,167, ("Cox") titled Aerosol Generator and Methods of Making and Using an Aerosol Generator (Ex. 1007); (2) United States Patent No. 8,375,957, ("Hon") titled Electronic Cigarette (Ex. 1008); and (3) Chinese Patent Application Publication No. CN 201104488Y ("Zhu") (Ex. 1009).

### 1.  Hon

The "Hon" reference disclosed an electronic cigarette that comprised  "a battery assembly [Figure 2b], an atomizer assembly [Figure 3], and a cigarette bottle assembly [Figure 4]."



The cigarette bottle assembly included the cigarette liquid bottle (401), fiber (402) and suction nozzle (403). (Hon, col. 3, ln. 48-49).

The atomizer assembly included the internal thread electrode (302), air-liquid separator (303), atomizer (307) and the secondary shell (306). One end of the secondary shell (306) was inserted into the cigarette bottle assembly for connection. (Hon, col. 3, ln. 32-37).

The battery assembly included the indicator (202), lithium ion battery (203), MOSFET electric circuit board (205), sensor (207), silica gel corrugated membrane (208), primary screwthread electrode (209), primary negative pressure cavity (210), and primary shell (211). (Hon, col. 3, ln. 4-8, Figure 2A). In an alternate embodiment for the battery assembly, MCU (microcontroller) (206) was added between MOSFET electric circuit board (205) and sensor (207). (Hon, col. 4, ln. 66-67, Figure 2B).

The sensor (207) of Hon was a *mechanical* pressure sensor. The sensor worked with a silica gel corrugated membrane (208). The silica membrane (208) deformed under negative pressure, that actuated a pressure switch spring (212). As described at col. 3, lns. 63-67 (embodiment 1) and col. 5, lns. 7-13 (embodiment 2):

> When the user slightly sucks the suction nozzle (403), the negative pressure forms on the silica gel corrugated membrane (208) through the air intake hole (503) and the primary and secondary negative pressure cavities (210, 301), and the silica gel corrugated membrane (208), under the action of 65 suction pressure difference, distorts to drive the switch spring (212) and sensor (207), thus invoking MOSFET electric circuit board (205).

14

Id.

As noted above, Hon relied on a *mechanical* pressure sensor. Mechanical pressure sensors detect negative pressure generated by the user's sucking action that causes a silica membrane to distort and actuate a switch mechanism. The pressure sensor of Hon was not an "electric" sensor, nor was it an "airflow" sensor. Hon did not "detect air movement generated by a user's inhaling or puffing act" like the '622 patent and as required by the parties' agreed claim construction of the term "electric airflow sensor."

Additionally, Hon failed to disclose a single chip microcontroller that "provides a signal that tells the power supply to provide or not provide electricity to the inhaler and atomizer."

Hon disclosed two embodiments. The first embodiment did not disclose a microcontroller. The sensor (207) directly invoked a MOFSET switch and circuit board (205). The MOFSET directly controlled the flow of current to the heating element. (Hon, col. 3, ln 65 – col. 4, ln. 6).

The second embodiment added an MCU (microcontroller) (206) between the MOSFET electric circuit board (205) and sensor (207). The MCU provided a signal to control the MOFSET and, as in the first embodiment, the MOFSET controlled the flow of current to the heating element. (Hon, col. 5, ln. 12-20 ("the

lithium ion battery (203) electrifies the heating body (305) inside the atomizer (307) through MOSFET electric circuit board (205)")).

The first embodiment disclosed by Hon did not contain an MCU. The MCU of the second embodiment did not "provide a signal that tells the power supply to provide or not provide electricity to the inhaler and atomizer," as claimed in the '622 patent and as defined by the parties' agreed upon claim construction. Hon's power supply was controlled by the MOFSET circuit, not the MCU. Hon failed to disclose an MCU that controls the "magnitude" of the electrical current provided to the atomizer as claimed in the '622 patent.

### 2. Cox

The "Cox" reference disclosed an aerosol generator and methods of making and using an aerosol generator. Cox comprised, generally, a first component (23) for housing a substance to be vaporized and a heater (33), a second component (25) for housing a power source and control circuitry (43). (Cox, col. 3, ln. 47 -62). Valve (35) is provided to open and close to allow substance to flow to the heating tube, in response to a signal provided by an air flow detecting device 51.



FIG.1

The air flow detecting device 51 of Cox was not disclosed or described. The only sensors actually described and enabled by Cox, were "pressure drop detecting devices."  Cox, col. 6, ln. 46-53 (describing specific pressure drop sensors suitable, and simply stating that the inventor "believes" other flow-sensing devices are suited.)

Unlike the '622 patent's electric airflow sensor, Cox relied on a pressure sensor. The pressure sensor disclosed by Cox was not "electric" nor was it an "airflow" sensor that "detects air movement generated by a user's inhaling or puffing act," as required by the '622 patent and the parties' agreed upon claim construction of the term "electric airflow sensor."

Cox failed to disclose a single chip microcontroller that "provides a signal that tells the power supply to provide or not provide electricity to the inhaler and atomizer."  Cox provided a controller, but failed to disclose the type of controller, and did not disclose a single chip microcontroller. The controller of Cox also did

not provide a signal to the power supply that controls "the strength of the current that is provided to the heating element," as claimed in the '622 patent and required by the parties' agreed upon construction of the term "time period and magnitude of the electric current."

Cox simply disclosed a controller that opened a valve and a switch that "opens" the power source and allowed current to flow. Cox did not disclose a controller that instructed the magnitude of the current sent to the heating element. Cox provides that:

> In response to the signal, the control device 43 preferably controls the supply of power from the power source 41 such that the valve 35 is opened and power is supplied to the heater 33 to cause it to heat up to its desired operating temperature.

Cox, col. 4, ln. 30-35.

The '622 patent is differentiated from Cox by, inter alia, teaching a controller that instructs the magnitude of the current sent to the heating element.

### 3.    Zhu

The "Zhu" reference disclosed an electronic cigarette that comprised a controller 100 and generator 200. (Zhu, Ex. 1009 p. 7.)  The controller 100 comprised a rechargeable lithium battery 2, an integrated circuit board 3, a miniature gas transmission switch 4, and a negative pressure chamber 5,

sequentially. Id. The generator 200 comprised a liquid storage chamber 12 and heater 9. (Id. at p. 8.)



图1

图3

As shown in Figure 3, Zhu relied on a negative pressure chamber 5 to sense a user's puffing action, and failed to disclose teach, or otherwise make obvious, the use of an electric airflow sensor, as required by all of the challenged claims of the '622 patent.

> As shown in Figure 3…An extending soft rubber piece is connected to the described elastic ring 401, and a plastic rod 402 is installed in the soft rubber piece to connect the elastic ring 401 and the moving contact piece 406….
>
> When the user sucks and inhales, the airflow enters from the air inlet hole 702, and the secondary switch air valve 701 is opened by the air flow to form a negative pressure chamber 5 between the right side of the elastic ring 401 and the connecting conductor 6 under the action of the airflow. Under the action of negative pressure, the elastic ring 401 moves to the right and drives the moving contact piece 406 connected to the plastic rod 402 to move to the right at the same time so as to be connected to the fixed contact piece 403 that is connected to the integrated circuit board 3.

19

> When the suction force of the user decreases, the secondary switch air valve 701 is closed...Only when the user stops sucking and inhaling...the negative pressure disappears immediately...thereby controlling the real-time heating of the heater 9.

Zhu, Ex. 1009, p. 8-9.

Zhu utilized the negative pressure chamber to cause the elastic ring 401 to move, and thereby drive contact piece 406 to connect to the fixed contact piece 403, thereby creating an operable circuit. Zhu did not employ a "sensor," but merely utilized a pressure switch that mechanically connected a circuit when under negative pressure.

The pressure sensor of Zhu did not "send a signal" to the integrated circuit. Rather, it merely causes the contact piece 401 to create a circuit connection with the integrated circuit through contact piece 403. The negative pressure chamber of Zhu was not an "electric" sensor, it did not "detect air movement generated by a user's inhaling or puffing act," and it did not send a signal to the integrated circuit.

Additionally, Zhu failed to disclose a single chip microcontroller that "provides a signal that tells the power supply to provide or not provide electricity to the inhaler and atomizer."

As an initial matter, Zhu provided an Integrated Circuit (IC1), but failed to disclose the type of circuit, and did not disclose a single chip microcontroller. The controller of Zhu also did not provide a signal to the power supply that

20

controls "the strength of the current that is provided to the heating element," claimed in the '622 patent and as required by the parties' agreed upon construction of the term "time period and magnitude of the electric current."

Zhu simply disclosed a pressure switch. The integrated circuit of Zhu did not provide a signal to control the current sent to the atomizer. Zhu does not disclose, teach or otherwise make obvious a controller that instructs the magnitude of the current sent to the heating element, as claimed in the '622 patent.  Zhu provided that:

> When the user suck and inhales, the air flow inside the control 100 flow to the generator 200, thereby driving the free-standing cavity on the right side of the elastic ring 401 of the controller 100 to be lower than the normal atmospheric pressure…the switch air nozzle is extended towards the side of the connecting conductor 6 under the action of negative pressure on one side of the generator 200, thereby driving the moving contact piece and the static contact piece on it to conduct current. At this time, the indicator light slowly lights up under the control of the IC, and current flows through the connecting conductor to make the heater work.

Zhu, Ex. 1009, p. 11.

The mechanical pressure switch caused the circuit to close under negative pressure when a user puffed and this allowed current to flow to the heating element.  Nothing in Zhu suggested or taught that the integrated circuit controls "the strength of the current that is provided to the heating element," as claimed in the '622 patent and required by the parties' agreed upon construction.

## IV.    ANALYSIS

### A. Institution should be denied because the patented invention is distinguishable from the cited prior art.

Petitioner challenges independent Claim 13 and its dependent claims 14-15, independent Claim 16, and independent Claim 17 and its dependent claim 18, on the following grounds:

| Ground | Claims Challenged | Basis | Cited Prior Art |
|---|---|---|---|
| 1 | 13, 14, 15, 17, 18 | § 102 | USPN 8,375,957 ("Hon") |
| 2 | 13, 14, 15 | § 102 | USPN 6,234,167 ("Cox") |
| 3 | 16 | § 103 | Hon in view of Chinese Patent Application, CN201104488Y ("Zhu") |
| 4 | 16, 17, 18 | § 103 | Cox in view of Zhu |

### 1.    Ground 1 – Claims 13, 14, 15, 17 and 18 Are Not Anticipated under § 102 by Hon.

"A claim is anticipated only if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference." *Verdegaal Bros. v. Union Oil Co. of California*, 814 F.2.d 628, 631 (Fed. Cir. 1987); *See Also* MPEP § 2131.

Claims 13 and 17 are independent claims. Claims 14 and 15 depend from claim 13. Claim 18 depends from Claim 17. Neither the "electric airflow sensor"

element nor the "single chip micyoco" element of the '622 patent claims are disclosed in Hon. *"In an [inter partes review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable."* *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3); ("35 U.S.C. § 316(e); *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (The burden never shifts to Patent Owner.); See also, 37 C.F.R. § 42.104.

Claims 13 and 17 require an "electric airflow sensor." Claims 14, 17 and 18 further require that the "electric airflow sensor is a diaphragm microphone." Hone disclosed neither.

Hon disclosed a *mechanical* switch, not an electrical airflow sensor. Hon's *mechanical* switch, actuated by a silica membrane that deformed under negative pressure. (Hon col. 3, lns. 63-67, col. 5, lns. 7-13). Jupiter mischaracterized the mechanical switch of Hon in the Petition. (Pet. at 22).

The sensor of Hon is mechanical, not electrical. The sensor of Hon did not "detect an airflow," but merely detected a negative pressure.

The preferred electric airflow sensor of the '622 patent is a diaphragm microphone. "Diaphragm microphone" is defined in the parties' agreed upon construction as "a device for converting pressure waves into electrical energy using a thin sheet of material that is capable of vibrating." (Ex. 1006). Petitioner tried to

equate the silica membrane of a mechanical switch disclosed by Hon with the electrical airflow sensing diaphragm microphone as the '622 patent, but Jupiter ignored the "microphone" portion of the claim element.  The silica membrane of Hon is not a microphone. The silica membrane does not "convert pressure waves into electrical energy using a thin sheet of material that is capable of vibrating," as required by the parties' agreed upon claim construction.

Claim 13 (and thereby Claims 14 and 15) requires a "single chip micyoco," and that the single chip "instructs the electric power source to send an electric current to the electronic atomizer and a time period and a magnitude of the electric current."

Hon failed to disclose a single chip microcontroller, that "provides a signal that tells the power supply to provide or not provide electricity to the inhaler and atomizer." Further, Hon failed to disclose a single chip microcontroller that controls the "magnitude of the electric current" sent to the atomizer.

As identified in the Petition, "the lithium ion battery (203) electrifies the heating body (305) inside the atomizer (307) and **sends an electric current to the electronic atomizer through MOSFET electric circuit board (205)**." (Pet. at 25 (citing Hon, col. 3, ln. 57 – col. 4, ln. 18))(emphasis added).

Hon disclosed a MOFSET switch, not a microcontroller, in one embodiment. In the second embodiment, Hon did not control the heating element, nor did Hon instruct a magnitude of current.

Hon failed to disclose a microcontroller that controls the current sent from the power source. Hon disclosed a MOFSET switch that controlled the flow of current to the atomizer. Hon made no mention of controlling the "magnitude" of the current.

Petitioner failed to meet its burden to establish a likelihood that Claims 13, 14, 15, 17 and 18 are unpatentable as anticipated by Hon.

    2.    **Ground 2 – Claims 13, 14, and 15 Are Not Anticipated under §102 by Cox**.

Petitioner failed to meet its burden. The "electric airflow sensor" and "single chip micyoco" required by the challenged claims are not disclosed in Cox.

Claims 13 requires an "electric airflow sensor" and a "single chip micyoco.'" The "electric air flow sensor" detects air movement generated by the user's inhaling or puffing act. The "single chip micyoco" then sends a signal to control the current flow to the atomizer and "instructs a time period and magnitude of the electric current."

Cox failed to disclose an electronic airflow sensor. The airflow detecting device 51 of Cox is neither disclosed nor described. The only sensors described and enabled by Cox, are "pressure drop detecting devices." Cox, col. 6, ln. 46-53

(describing specific pressure drop sensors suitable, and simply stating that the inventor "believes" other flow-sensing devices are suited.); see also, Ex. 1017 (specification for the Honeywell® pressure sensor disclosed in Cox.)

"The disclosure in an assertedly anticipating reference must provide an enabling disclosure of the desired subject matter; mere naming or description of the subject matter is insufficient, if it cannot be produced without undue experimentation." MPEP § 2121.01 (citing *Elan Pharm., Inc. v Mayo Found For Med. Educ. & Research*, 346 F.3d 1051, 1054 (Fed. Cir. 2003)(Without a disclosure enabling one skilled in the art to produce a transgenic mouse without undue experimentation, the reference would not be applicable as prior art.)).

The sensor disclosed by Cox is mechanical, not electric. The sensor disclosed by Cox did not "detect an airflow" but merely detected a negative pressure. Cox's "mere naming" of a mechanical airflow sensor, coupled with the inventor's belief it may be suitable, did not enable the use of an electric airflow sensor disclosed in the '622 patent. *Id.* "In determining that quantum of prior art disclosure which is necessary to declare an applicant's invention 'not novel' or 'anticipated' within section 102, the stated test is whether a reference contains an 'enabling disclosure'..." *In re Hoeksema*, 399 F.2d 269, 158 USPQ 596 (CCPA 1968). Cox failed to provide an enabling disclosure for an "electric airflow sensor."

Claim 13 require a "single chip micyoco," and that the single chip micyoco "instructs the electric power source to send an electric current to the electronic atomizer and a time period and a magnitude of the electric current."

Cox failed to disclose a single chip microcontroller that "provides a signal that tells the power supply to provide or not provide electricity to the inhaler and atomizer."

Cox disclosed a controller generically. Cox failed to disclose the type of controller. Cox did not specifically disclose a single chip microcontroller. The controller of Cox did not provide a signal to the power supply that controlled "the strength of the current that is provided to the heating element," as claimed in the '622 patent and required by the parties' agreed upon claim construction.

Cox simply disclosed a generic controller that opened a valve and switch that "opens" the power source and allowed current to flow. Cox provided that:

> In response to the signal, the control device 43 preferably controls the supply of power from the power source 41 such that the valve 35 is opened and power is supplied to the heater 33 to cause it to heat up to its desired operating temperature.

Cox, col. 4, ln. 30-35.

Cox did not disclose a controller that instructed the magnitude of the current sent to the heating element, as required by the claims of the '622 patent, and as required by the parties agreed upon claim construction.

27

For the reasons stated above, Petitioner failed to meet its burden to establish a likelihood that Claims 13, 14, and 15 are unpatentable as anticipated by Cox.

### 3.    Ground 3 – Claim 16 is Not Obvious under §103 by Hon in View of Zhu.

Claim 16 is an independent claim. Claim 16 requires an "electric airflow sensor."

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).

Hon failed to disclose, teach or otherwise make obvious an "electric airflow sensor." Zhu also failed to disclose, teach or otherwise make obvious an "electric airflow sensor." Petitioner failed to provide a basis to establish how an "electric airflow sensor" was made obvious by the combination of these two disclosures, neither of which disclosed such a sensor.

The Board denied institution where, as here, a petitioner presented a Section 103 obviousness challenge founded on an incorrect assertion that the combination of prior art adds up to every claim limitation. *See Sony Interactive Entertainment LLC v. BOT M8, LLC*, IPR2020-01218, Paper 8 (P.T.A.B. Jan. 27, 2021)(Denying institution where the numerous obviousness where Petitioner failed to point to "any

explicit disclosure" but instead "relie[d] on [expert] testimony that a person of skill in the  art" would understand that the challenged claim element would be obvious.)

Petitioner's obviousness arguments are based entirely on its expert's self-serving and conclusory opinions. The Declaration of Mark Scatterday (Ex. 1019) offers no evidence to support his statements regarding the state of the of the art at the time of the invention. Mark Scatterday is the Chairman of Tilt Holdings, Inc., the parent company of Petitioner Jupiter.

Expert testimony cannot establish missing elements from challenged claims. *See,* PTAB Consolidated Trial Practice Guide, November 2019, at 36 ("Expert testimony, however, cannot take the place of a disclosure in a prior art reference, when the disclosure is required as part of the unpatentability analysis."); *K/S Himpp v. Hear-Wear Techs., LLC*, 751 F.3d 1362, 1365 (Fed. Cir. 2014) (conclusory assertions about knowledge in the art cannot, without supporting evidence, supply a missing claim limitation).

Jupiter's expert, David Boehmer, failed to provide any evidence to support his conclusions that the pressure switch of Hon, using a silica membrane, and Hon's mere mention of the potential use of electrical components discloses the electric airflow senor and diaphragm microphone of the '622 patent. (Ex. 1004 at 58-59). As in *Sony,* IPR2020-01218, Jupiter does not point to "explicit disclosures" in the art, and instead merely relies on the conclusory expert testimony that the

clime elements would be obvious to one skilled in the art. *Sony,* IPR2020-01218, Paper 8 at 20.

As shown in Figure 3, Zhu relied on a negative pressure chamber 5 to sense a user's puffing action.  Zhu utilized the negative pressure chamber to cause the elastic ring 401 to move, and thereby drive contact piece 406 to connect to the fixed contact piece 403, and thereby creating an operable circuit. Zhu did not employ a "sensor", but merely utilized a pressure switch.

Both Zhu and Hon failed to disclose teach, or otherwise make obvious, the use of electric airflow sensor.

### 4.  Ground 4 – Claims 16, 17 and 18 are Not Obvious under § 103 by Cox in View of Zhu.

Claims 16, 17 and 18 all required an "electric airflow sensor." Neither Cox nor Zhu disclosed, taught or otherwise made obvious an "electric airflow sensor." Petitioner failed to provide a basis to establish how an "electric airflow sensor" was made obvious by the combination of these two disclosures, neither of which disclosed such a sensor.

In addition, Claims 17 and 18 further require that the electric airflow sensor is a "diaphragm microphone." Nothing in the disclosures of Cox or Zhu described, taught or otherwise made obvious the use of a diaphragm microphone as the airflow sensor for an electronic cigarette.

### B.  The Petition is time barred under § 315(b)

Section 315(b) unambiguously prohibits institution where the IPR petition is filed more than one year after the petitioner, real party in interest, or privy of the petitioner "is served with a complaint" alleging patent infringement. 35 U.S.C. § 315(b) ("An inter partes review may not be instituted if the petition requesting the proceeding is filed more than 1 year after the date on which the petitioner, real party in interest, or privy of the petitioner is served with a complaint alleging infringement of the patent.")

"Simply put, § 315(b)'s time bar is implicated once a party receives notice through official delivery of a complaint in a civil action, irrespective of subsequent events." *Click-To-Call Techs., LP v. Ingenio, Inc.*, 899 F.3d 1321, 1330 (Fed. Cir. 2018), vacated and remanded sub nom. *Thryv, Inc v. Click-To-Call Techs., LP*, 140 S. Ct. 1367, 206 L. Ed. 2d 554 (2020), and vacated sub nom. *Click-To-Call Techs., LP v. Ingenio, Inc*., 810 F. App'x 881 (Fed. Cir. 2020).

> The time bar is not merely about preliminary procedural requirements that may be corrected if they fail to reflect real-world facts, but about real-world facts that limit the agency's authority to act under the IPR scheme. The timely filing of a petition under § 315(b) is a condition precedent to the Director's authority to act. It sets limits on the Director's statutory authority to institute, balancing various public interests. And like § 315 as a whole, it governs the relation of IPRs to other proceedings or actions, including actions taken in district court.

*Wi-Fi One, LLC v. Broadcom Corp.*, 878 F.3d 1364, 1374 (Fed. Cir. 2018)(en banc) (holding that § 315(b) "sets forth a 'condition precedent to the Director's authority to act,' based on the 'timely filing of a petition,'" and "'if a petition is not filed within a year after a real party in interest, or privy of the petitioner is served with a complaint, it is time-barred by § 315(b), and the petition cannot be rectified and in no event can IPR be instituted.'")

A party's receipt of notice of the filing of a complaint is the critical date that begins the running of the one-year period to file the IPR petition under § 315(b). "[T]he text of § 315(b) is agnostic as to the 'effect' of the service—i.e., what events transpired after the defendant was served. The provision only probes whether the petitioner, real party in interest, or privy of the petitioner was served with a complaint alleging patent infringement more than one year before the IPR petition was filed." *Click-To-Call,* 899 F.3d at 1333.

A party's receipt of notice of the filing of the complaint controls. The plain language of the statute says that the date the petitioner is "served with a complaint" begins the clock ticking. So under the plain language, the petitioner receives notice of the complaint on the date of service. A defendant's receipt of notice of the assertion of patent infringement claims serves the core function of service, namely "to supply notice of the pendency of a legal action, in a manner and at a time that

affords the defendant a fair opportunity to answer the complaint and present defenses and objections." *Henderson v. United States*, 517 U.S. 654, 672 (1996).

Here Jupiter received notice on November 19, 2020, when VPR e-mailed Jupiter a Notice of Lawsuit and Request to Waive Service. Exhibit 2010. Service of the Notice of Lawsuit was official delivery of the complaint on Jupiter in the Arizona Case. The Notice said:

---

**NOTICE OF A LAWSUIT AND REQUEST TO WAIVE SERVICE OF A SUMMONS**

To: Jupiter Research, LLC
*(Name of the defendant or - if the defendant is a corporation, partnership, or association - an officer or agent authorized to receive service)*

**Why are you getting this?**

A lawsuit has been filed against you, or the entity you represent, in this court under the number shown above. A copy of the complaint is attached.

This is not a summons, or an official notice from the court. It is a request that, to avoid expenses, you waive formal service of a summons by signing and returning the enclosed waiver. To avoid these expenses, you must return the signed waiver within __30__ days *(give at least 30 days, or at least 60 days if the defendant is outside any judicial district of the United States)* from the date shown below, which is the date this notice was sent. Two copies of the waiver form are enclosed, along with a stamped, self-addressed envelope or other prepaid means for returning one copy. You may keep the other copy.

---

Exhibit 2010.

The plain meaning of the phrase "served with a complaint" is "presented with a complaint" or "delivered a complaint" in a manner prescribed by law. *Click-To-Call,* 899 F.3d at 1324. Jupiter was "presented with a complaint" in the "manner prescribed by law", pursuant to Rule 4(d) of the Federal Rules, on November 19, 2020. *Id.* Black's Law Dictionary defines "serve" as "[t]o make legal delivery of (a notice or process)" or "[t]o present (a person) with a notice or process as required by law," and defines "service" as "[t]he formal delivery of a writ, summons, or other legal process[.]" Black's Law Dictionary 1491 (9th ed.

2009). Jupiter was served with the complaint along with the request for waiver of service on November 19, 2020.

On November 19, 2020, Jupiter was given a reasonable opportunity to understand and identify the patent claims against it as of the date of service of the Notice of Lawsuit. That notice was the critical date for purposes of § 315(b)'s estoppel. See 157 Cong. Rec. S5429 (daily ed. Sept. 8, 2011) (statement of Sen. Kyl that "in light of the present bill's enhanced estoppels, it is important that the section 315(b) deadline afford defendants a reasonable opportunity to identify and understand the patent claims that are relevant to the litigation.")

The "subsequent act" of filing the waiver of service is irrelevant for purpose of § 315(b). Other non-binding advisory non-precedential PTAB rulings issued prior to *Click-to-Call* relied on by Petitioner, pegging the notice or service date as the filing date of the waiver with the court do not control here. Those decisions erroneously relied on Fed. R. Civ P. 4(d)(4), which by its unambiguous text *only applies to the Federal Rules,* and not to other federal statutes, such as § 315(b). See, e.g., *Brinkmann Corp. v. A&J Mfg*., LLC, 2015 WL 1347446 at 4 (P.T.A.B. Mar. 23, 2015) (citing to Fed. R. Civ P. 4(d)(4) as authority for its decision to rely on the waiver of service filing date); *Motorola Mobility LLC v. Arnouse*, (P.T.A.B. Jan. 30, 2013) (same); *Scotts Co. LLC v. Encap, LLC,* (P.T.A.B. July 3,

2013)(same); see also Fed. R. Civ P. 4(d)(4)("…these rules apply as if a summons and complaint had been served at the time of filing the waiver.")

Using the filing date of a service waiver to set the one year bar date under § 315(b) directly contravenes the Federal Circuit's guidance in *Click-to-Call.* As stated in *Click-to-Call*, for the purpose of § 315(b), the date of service is not "subject to any subsequent act or ruling." 899 F.3d at 1330. The filing of a service waiver is an event that transpired after the defendant was served. The non-binding decisions predating *Click-to-Call* cited by petitioner should not be followed by this tribunal.

### 1.    It is Petitioner's Burden to Demonstrate Timeliness and Jupiter has Failed to Meet its Burden

"It is 'the IPR petitioner [who] bears the burden of persuasion to demonstrate that its petitions are not time-barred under § 315(b) based on a complaint served on a real party in interest more than a year earlier.' *RPX Corp. v. Applications in internet time, LLC.* IPR 2015-01750 (PTAB Oct. 2, 2020) quoting *Worlds Inc. v. Bungie, Inc.*, 903 F.3d 1237, 1242 (Fed. Cir. 2018). The same logic requires placing the burden on IPR petitioners to demonstrate that their petitions are not time-barred under § 315(b) based on a complaint served on a real party in interest or a privy more than a year before a petition is filed. *See Ventex Co., Ltd. v. Columbia Sportswear N. Am., Inc.*, IPR2017-00651, Paper 152 at 4–5 (PTAB Jan. 24, 2019) (precedential) (citing Worlds, 903 F.3d at 1242).

Jupiter, not VPR, bears the burden of establishing that service was not effectuated until a date within the one year period prior to the filing of the petition. Jupiter cannot meet this burden.

"[T]he plain meaning of the phrase 'served with a complaint' is 'presented with a complaint' or 'delivered a complaint' in a manner prescribed by law." *Click-To-Call*, 899 F.3d at 1330. Jupiter was "presented with a complaint" in the "manner prescribed by law", pursuant to Rule 4(d) of the Federal Rules, on November 19, 2020. Jupiter formally executed the Waiver on December 15, 2020. That waiver was Jupiter's acknowledgement that it received the Complaint on November 19, 2020, which is outside the one year bar period.

### 2. Jupiter Executed the Waiver of Service Acknowledging Receipt of the Complaint More than One Year Before the Petition was Filed.

Jupiter, through counsel, executed the waiver of service on December 15, 2020. Exhibit 2009. The signed waiver acknowledged that Jupiter "received a copy of the complaint," and "waived any objections to the absence of…service." *Id*.

Jupiter filed this IPR petition on December 20, 2021, one year and five (5) days after the waiver was signed. Jupiter's petition was five (5) days late and barred by § 315(b).

Once again, it makes no sense to reward Jupiter by setting the bar date as the date VPR filed Jupiter's waiver with the court in the Arizona Case. Jupiter

received procedural benefits under the Federal Rules from waiving service, such as 60 days to answer instead of the usual 21 days. If Congress wanted to give petitioners in IPRs additional time or benefits if they signed waivers of service in district court actions it could have done so but it did not. There is no exception or extension to § 315(b)'s one year bar for petitioners who sign waivers of service.

## V.    The requested review should not be instituted because of Jupiter's Undue Delay, and because it is unnecessary and counterproductive to litigation costs.

Jupiter, despite being well aware of the patent claims relevant to this litigation, strategically delayed the filing of its IPR to the last possible moment. To gain every inch of advantage, Jupiter filed its IPR over two (2) years after receiving a letter detailing the dispute of this patent infringement.

Congress and the Patent Office designed IPRs "to establish a more efficient and streamlined patent system that will improve patent quality and limit unnecessary and counterproductive litigation costs" (emphasis added)); *see* H. Rep. No. 112-98, Part I, at 48 (2011). The way the IPR procedure is being used in this case is counterproductive and contrary to legislative intent. The parties have already stipulated the construction of all the disputed terms and expanded significant resources to get to the current procedural posture. An IPR is supposed to provide a cost-effective alternative to litigation, not an added expense to litigation as it is being used here.

The legislative history of 35 U.S.C. § 315(b) shows that the primary concern related to the one-year time period was to provide defendants sufficient time to fully analyze the patent claims, but not to create an open-ended process. See 157 Cong. Rec. S5429 (daily ed. Sept. 8, 2011) (statement of Senator Kyl) ("it is important that the section 315(b) deadline afford defendants a reasonable opportunity to identify and understand the patent claims that are relevant to the litigation"). In other words, the interpretation of 35 U.S.C. § 315(b) must be consistent with the legislative intent to provide defendants sufficient time to analyze the patent claims so that they can decide whether to challenge the patentability of the claims in an inter partes review.

There is no explanation for Jupiter's unjustifiable delay other than tactical gamesmanship. Jupiter failed to timely disclose its invalidity analysis in the District Court Action. Jupiter waited until the last possible moment to file its IPR and disclose its invalidity analysis in this dispute. Jupiter's unjustified delay in filing its IPR petition alone is sufficient basis for denial. See, e.g., *Realtime Data LLC v. Actian Corporation*, No. 6:15-CV-463-RWS-JDL, 2016 WL 3277259, at *3 (E.D. Tex. June 14, 2016) ("Defendants waited between seven and eleven months to file their IPR petitions…which demonstrates a lack of diligence on the

part of the Defendants, and they have not attempted to provide an explanation for this unjustifiable delay.")[4]

Jupiter is using the IPR procedure "as a tool for harassment or litigation gamesmanship." *Johnson Health Tech. Co. v. Icon Health & Fitness, Inc.*, IPR2014-01242, Paper 16 (PTAB Feb. 11, 2015) (institution denied). Jupiter violated the rules on patent lawsuit disclosures that "require both the plaintiff and the defendant in patent cases to provide early notice of their infringement and invalidity contentions, and to proceed with diligence in amending those contentions when new information comes to light in the course of discovery." *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1365–66 (Fed. Cir. 2006). Patent litigation "require[s] parties to crystallize their theories of the case early in litigation and to adhere to those theories once they have been disclosed." Id. at 1366 n.12. Instead of disclosing its invalidity claims in this case as required, Jupiter is using its later filed IPR to advance new theories of invalidity.

Jupiter's late disclosure of its invalidity analysis was never explained or justified. Jupiter has not demonstrated diligence. *West v. Jewelry Innovations, Inc.*,

---

[4] *TruePosition, Inc., v. Polaris Wireless, Inc.*, No. CV 12-646-RGA/MPT, 2013 WL 5701529, *6 (D. Del. Oct. 21, 2013), report and recommendation adopted, No. CV 12-646-RGA, 2013 WL 6020798 (D. Del. Nov. 12, 2013) (finding that filing IPR petitions close to the statutory deadline "may suggest an unfair tactical advantage or dilatory motive"); *Pragmatus Mobile, LLC v. Amazon.com, Inc.*, No. CV 14-436-LPS, 2015 WL 3799433, at *1 (D. Del. June 17, 2015) ("The timing of Moving Defendants' filing suggests they may be seeking a tactical advantage, given they were aware of the prior art asserted in their IPR petition many months before filing the petition just three days before the statutory deadline."); *TPK Touch Solutions, Inc v. Wintek Electro-Optics Corporation*, 2013 WL 6021324 (N.D. Cal. 2013) (noting lack of diligence by patent challenger in requesting IPR).

No. C 07–1812 JF (HRL), 2008 WL 4532558, at *3 (N.D. Cal. Oct. 8, 2008) (finding that the defendant did not establish diligence of its prior art search because it did "not provide any information about when or why it began the inquiries…"); *Streak Prods., Inc. v. Antec, Inc.*, 2010 WL 3515752, at *2 (N.D. Cal. Sept. 8, 2010) (requiring defendant to submit declarations describing their prior art search).

## VI.    The Board should use its discretion under § 314(a) to deny institution.

Institution of *inter partes* review is discretionary. 35 U.S.C. § 314(a); *Oil States Energy Servs. LLC v. Green's Energy Grp., LLC*, 138 S. Ct. 1365, 1371 (2018) ("The Decision whether to institute inter partes review is committed to the Director's discretion."). The Board should exercise its discretion under § 314(a) to deny institution for under its precedential decision in *NHK Spring*[5] and later expanded on in *Apple v. Fintiv.*[6]

In *Apple v. Fintiv*, the Board denied institution based on its discretion under § 314(a) despite a trial date not being set. The Board considered factors related to a parallel, co-pending proceeding in determining whether to exercise its discretionary denial.

The Board's decisions have balanced the following factors: (1) whether the court granted a stay or evidence exists that one may be granted if a

---

[5] *NHK Spring Co., Ltd., v. Intri-Plex Techs., Inc.*, IPR2018-00752, Paper 8 (PTAB Sep. 12, 2018) (precedential).
[6] *Apple Inc., v. Fintiv, Inc.,* IPR2020-00019, Paper 11 (PTAB March, 2020) (precedential).

proceeding is instituted; (2) proximity of the court's trial date to the Board's

projected statutory deadline for a final written decision; (3) investment in the

parallel proceeding by the court and the parties; (4) overlap between issues

raised in the petition and in the parallel proceeding; (5) whether the petitioner

and the defendant in the parallel proceeding are the same party; and (6) other

circumstances that impact the Board's exercise of discretion, including the

merits. *Apple Inc., v. Fintiv, Inc.,* IPR2020-00019, Paper 11 at 5 (PTAB March,

2020) (precedential).

  Here, the *Fintiv* factors weigh in favor of denial to institute.

### 1.    The District Court has not granted a stay despite a motion being filed about four (4) months ago in December, 2021.

Jupiter filed a motion to stay on December 28, 2021, which has yet to be

ruled on, despite having numerous conferences with the Magistrate and the

District Court Judge since the filing of the motion. The Court has not made any

indication that a stay would be granted if the Board decides to institute this

petition.[7]

  To the contrary, the Court has recently intervened in the parties' discovery

disputes, and held a hearing on March 18, 2022 where it ordered the parties to

continue discovery. (Ex. 2005, at ECF 43).

---

[7] MONQ, LLC, is a defendant in a separate action which also filed a motion to stay on December 28, 2021, which was also not ruled on.

### 2.    No trial date is set; discovery is set to close in June, and dispositive motions are due in July.

This case, like the NHK case, is in the "advanced state" of the parallel

district court litigation with upcoming deadlines. According to the Scheduling

order, all discovery must be completed by Friday, June 03, 2022 (less than two

(2) months from the date of this submission). Additionally, all dispositive

motions, including *Daubert* motions, shall be filed no later than Wednesday, July

06, 2022. The Board is not anticipated to make a decision on institution until a

after the above deadlines but before July 14, 2022.

Additionally, according to the Scheduling Order, the parties must

complete all pre-trial disclosure required under Fed. R. Civ. P. 26(a)(3) on or

before Monday, August 01, 2022.

A trial date in the district court action is likely to be set and completed

prior to the final decision of this petition by the Board. In *Abbott Vascular*, the

Board declined to adopt a bright-line rule that an early trial date alone requires

denial in every case. *See Abbott Vascular, Inc. v. FlexStent, LLC*, IPR2019-

00882, Paper 11 at 31 (PTAB Oct. 7, 2019). The Board's cases addressing earlier

trial dates as a basis for denial under *NHK* have sought to balance considerations

such as system efficiency, fairness, and patent quality. [8]

---

[8] *See Magellan Midstream Partners L.P. v. Sunoco Partners Marketing & Terminals L.P.*, IPR2019-01445, Paper 12 at 10 (PTAB Jan. 22, 2020)(citing "unnecessary and

### 3.    The parties have invested a lot of time and effort in progressing the case in district court, including submitting a stipulated claim construction order which dispenses of the need of a *Markman* hearing.

In *NHK*, the patent owner argued the Board should deny institution under 35 U.S.C. § 314(a) because institution of a trial at the PTAB would be an inefficient use of Board resources in light of the "advanced state" of the parallel district court litigation in which the petitioner had raised the same invalidity challenges. IPR2018-00752, Paper 8. According to the Scheduling order, fact discovery shall be completed by Friday, June 03, 2022, which is before the Board is expected to make a decision on institution.

The Parties have submitted a stipulated claim construction order that has yet to be decided, however, the Court instructed Jupiter to supplement its disclosures based on the stipulated construction of the disputed terms. The Court does not need to hold a claim construction (Markman) hearing because the parties have agreed upon the claim constructions (Ex. 1006).

### 4.    The issues raised here are identical to the issues raised in the district court action.

---

counterproductive litigation costs" where district court would most likely have issued a decision before the Board issues a final decision); *Intel Corp. v. VLSI Tech. LLC*, IPR2019-01192, Paper 15 at 11 (PTAB Jan. 9, 2020) ("When considering the impact of parallel litigation in a decision to institute, the Board seeks, among other things, to minimize the duplication of work by two tribunals to resolve the same issue."); *Illumina, Inc. v. Natera, Inc.*, IPR2019-01201, Paper 19 at 6 (PTAB Dec. 18, 2019) ("We have considered the positions of the parties and find that, on this record, considerations of efficiency, fairness, and the merits of the grounds in the Petition do not weigh in favor of denying the Petition.").

The '622 patent is involved in parallel district court litigation that is considering the same issues, arguments, and evidence that Jupiter presented in its Petition. Allowing this petition to go forward would be against the precedent set in *NHK* and *Fintiv*.

> 5.    **The petitioner and the defendant in the parallel proceeding is the same party, Jupiter.**

The District Court action involves the same parties and the same issues. Jupiter is attempting to use the IPR and District Court action to get two chances at the same substantive arguments.

> 6.    **The petition should be denied on its merits; it is time-barred; and Petitioner engaged in undue delay.**

As outlined in detail throughout this response, institution of the IPR should be denied for numerous reasons. On the merits, Jupiter has failed to establish that the challenged claims are unpatentable over the cited prior art. Jupiter was served with a Complaint alleging infringement of the '622 patent on November 19, 2020, more than 13 months prior to filing its petition, and the petition is time-barred under 315(b). Jupiter, without explanation, delayed until the completion of claim construction, to file its petition.

Duplicating the district court's efforts would not be an efficient use of the Board's resources and would not serve one of the primary purposes of AIA proceedings: to provide an effective and efficient alternative to district court

litigation. A holistic evaluation of the factors demonstrates that efficiency and integrity of the system are best served by denying institution.

The Director should exercise its discretion and deny institution under 314(a).

## VII. CONCLUSION

For the foregoing reasons, the Director should deny institution based on the time bar set under section § 315(b), the waiver of service executed by Jupiter's counsel, Jupiter's undue delay in filing the petition, and to preserve the efficiency and resources of all parties involved.

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This PATENT OWNER'S PRELIMINARY RESPONSE complies with the type-volume limitation of 14,000 words, comprising 9,899 words, excluding the parts exempted by 37 C.F.R. §42.24(a)(1).

2.      This PATENT OWNER'S PRELIMINARY RESPONSE complies with the general format requirements of 37 C.F.R. §42.6(a) and has been prepared using Microsoft Word 2010 in 14 point Times New Roman font.

Date: April 14, 2022                   Respectfully submitted,

/s/Joseph A. Dunne
Joseph A. Dunne
Lead Counsel
175 Pearl St.
3rd Floor
Brooklyn, NY 11201
Main: (561) 404-4350
Direct: (929) 200-8446

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing PATENT OWNER'S

PRELIMINARY RESPONSE and all accompanying Exhibits were served

electronically via e-mail on April 14, 2022, in their entireties on the following

Attorneys for Petitioner:


Anthony L. Meola (Reg. No. 44,936)
SCHMEISER, OLSEN & WATTS, LLP
3 Manhattanville Road
Suite 105
Purchase, New York 10577
Phone: +1.914.825.1039
Email: ameola@iplawusa.com

Jeffrey William Johnson
Schmeiser Olsen & Watts LLP - Mesa, AZ
18 E University Dr., Ste. 101
Mesa, AZ 85201
480-655-0073